**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF MONTANA**
**BILLINGS DIVISION**

| | |
|---|---|
| **UNITED STATES OF AMERICA**, ) | Cause No. CR-12-107-BLG-JDS |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | **ORDER** |
| **GRADEN ROY NORLIN**, ) | |
| ) | |
| Defendant. ) | |
| _____ ) | |

INTRODUCTION

Defendant Graden Roy Norlin ("Norlin") is charged with Conspiracy to Possess Methamphetamine with Intent to Distribute and Distribution of Methamphetamine (Count I), Possession with Intent to Distribute and Distribution of Methamphetamine (Counts II, III), and Distribution of Methamphetamine (Count IV). Norlin seeks to suppress evidence obtained in the seizure of his car. On April 19, 2013, the Court held a hearing and heard testimony from several witnesses. The

hearing was continued until May 1, 2013, when the Court heard additional testimony and ordered supplemental briefing. After reviewing the briefs and exhibits the Court finds Norlin's Motion to Suppress and Dismiss Indictment unavailing.

## FACTUAL BACKGROUND

Sometime in November of 2011, law enforcement commenced an investigation of Norlin concerning distribution of methamphetamine in Billings and Livingston, Montana.

On January 31, 2012, at approximately 11:30 a.m., law enforcement in Livingston, Montana learned that Norlin was traveling eastbound on Interstate 90 towards Billings, Montana. The Drug Enforcement Agency was contacted and surveilled Norlin while he was in Billings. While in Billings, Norlin made several stops. Of particular note was a stop at the Magic City Organic Hydroponic Supply store. According to DEA Special Agent Daniel Dunlap ("Agent Dunlap"), law enforcement witnessed a transaction between Norlin and an individual later identified as Mark Cox in the store parking lot. During that transaction, Agent Dunlap observed Norlin and Mark Cox exchanging a powdery substance. Subsequently, Cox testified that he did not know Norlin and the transaction involved elemental sulfur used for spider mites as opposed to illegal drugs.

Next, Norlin traveled to a residence in Billings which law enforcement suspected was his source of supply. After a few more stops, law enforcement followed Norlin heading west on Interstate 90 at approximately 4:10 p.m. Norlin was ultimately pulled over by the Montana Highway Patrol Trooper James McMartin ("McMartin") outside Livingston at approximately 5:30 p.m.

McMartin was on patrol on January 31, 2012, on Interstate 90, between Billings and Livingston. Earlier that day, he had been notified that if Norlin's vehicle was pulled over he was to contact a Missouri River Drug Task Force (MRDTF) detective. McMartin testified that at approximately 5:05 p.m., at mile marker 352 on Interstate 90, he saw Norlin's pickup truck, swerving in the lane. While following the pickup truck, McMartin observed the truck cross the right fog line twice and the center line once.

McMartin testified that he suspected the driver might be intoxicated and initiated a traffic stop. He was accompanied by Park County Deputy Jason Hopkin ("Hopkin"). Field sobriety tests were performed on Norlin. McMartin testified that Norlin informed him that he suffered from COPD or Chronic Obstructive Pulmonary Disease. McMartin noticed that Norlin was shaking during the tests. Norlin asked McMartin to retrieve his inhaler from his pickup. While he was getting the inhaler, both Hopkin and McMartin noticed the strong odor of marijuana coming from

Norlin's truck. While at the truck, Norlin repeatedly attempted to grab for his jacket and was rebuffed by the officers. After an additional sobriety test was administered, both officers determined that Norlin was not intoxicated.

Following completion of the sobriety the tests, Norlin continued to shake uncontrollably, which McMartin believed showed signs of nervousness. McMartin allowed Norlin to sit in the front seat of his patrol car to warm up. He informed Norlin he was not under arrest and was free to leave, only he could not take his truck. Norlin used McMartin's cell phone to call his wife to come and pick him up.

While Norlin was in the patrol car, McMartin and Hopkin contacted Detective Tim Barnes ("Det. Barnes") of the MRDTF as directed and notified him of the marijuana odor, his shaking and appearing nervous, and repeated attempts to touch his jacket. Det. Barnes told McMartin he believed he had probable cause for a search warrant and not to let Norlin remove anything from the truck. McMartin testified that, when asked, Norlin denied him permission to search the truck.

Det. Barnes drafted an application for a search warrant and presented it to Park County Justice of the Peace, Judge Budeski.

The search warrant application includes the following information: 1) Det. Barnes interviewed a Confidential Source (CS) who identified Norlin's vehicles and stated that Norlin was bringing methamphetamine into Livingston, cutting it, and

selling it for $100 per gram; 2) A second CS (CS-2) stated that Norlin supplied him/her with methamphetamine at least 100 times. CS-2 identified other individuals to whom Norlin had supplied methamphetamine. Those associations were corroborated by law enforcement; 3) Norlin has a criminal history which includes convictions for Criminal Distribution of Imitation Dangerous Drugs and Criminal Possession of Dangerous Drugs; 4) On January 18, 2012, Det. Barnes interviewed two recently arrested persons who reported that Norlin was their main source of methamphetamine for the past year. One of these individuals reported seeing Norlin in possession of at least a pound of meth at one time; 5) On January 31, 2012, law enforcement saw a transaction between Norlin and another individual in a parking lot in Billings, Montana. Law enforcement reported seeing Norlin approach the driver's door of another vehicle and then Norlin walked back to his truck carrying a white container which appeared similar to an ice cream bucket; 6) On January 31, 2012, at the Interstate 90 traffic stop, Hopkin reported seeing a white container similar to a one gallon ice cream bucket behind the driver's seat of Norlin's pick up truck. Hopkin reported seeing on the front seat of Norlin's truck, in plain view, a tackle box sized container with a clear top that was full of what appeared to be a white crystalline substance; and 7) McMartin reported that Norlin appeared to be extremely nervous, his voice shaky, and his body trembling uncontrollably even while sitting

in a heated vehicle. *See* Application for Search Warrant, Defendant's Exhibit 544.

Judge Budeski found the application met the probable cause standard and issued a search warrant. A search of Norlin's truck found 31.8 grams of methamphetamine in his jacket and 136 grams of marijuana in a plastic container in the back seat.

## DISCUSSION

The Court agrees with the Government that, after the exhaustive evidentiary hearings, the salient issues appear to be winnowed down to two. First, whether McMartin had independent probable cause to initiate the traffic stop. Second, whether the search warrant was secured with false or misleading facts or material omissions. The remainder of the "procedural and factual irregularities" set forth by Norlin are not persuasive.

**I. Initial Traffic Stop**

Norlin first argues that the initial traffic stop was pre-textual and lacked "particularized suspicion" necessary for the initial traffic stop.

"Whether a Fourth Amendment violation has occurred 'turns on an objective assessment of the officer's actions in light of the facts and circumstances confronting him at the time' and not on the officer's actual state of mind at the time the challenged action was taken." *Maryland v. Macon*, 472 U.S. 463, 470–71, 105 S.Ct. 2778, 2783,

86 L.Ed.2d 370 (1985) (quoting *Scott v. United States*, 436 U.S. 128, 137, 98 S.Ct. 1717, 1723, 56 L.Ed.2d 168 (1978). The central question in determining whether a traffic stop was pre-textual is whether a reasonable officer would have made the stop apart from his suspicions about more serious criminal activity. See *U.S. v. Cannon*, 29 F.3d 472, 476 (9th Cir. 1994). In other words, the Court must focus on the objective assessment of McMartin rather than attempt to ascertain his subjective state of mind at the time of the stop.

McMartin testified that when he saw Norlin's vehicle he began to follow it. *Tr. 25.* McMartin observed Norlin swerving in his lane and cross the center line once and the fog line twice, which he testified first alerted him to get behind the vehicle. *Tr. 104.* McMartin testified that he would have pulled over any vehicle driving in this manner. *Id. at 104-105* This, the Government argues, gave him particularized suspicion to pull Norlin over for suspicion of driving under the influence.

Additionally, the Government points out that it had independent probable cause to pull Norlin over for suspicion of drug trafficking from Billings to Livingston.

Norlin makes much of the fact that McMartin's dash camera failed to record any of Norlin's erratic driving. Additionally, Norlin argues, there is no audio narration by McMartin of him swerving despite McMartin's testimony that this was his general practice.

The Government explains this lapse as an equipment malfunction. The Government elicited testimony from other law enforcement officer's that with older VHS systems, similar to the one used by McMartin, audio and video cut-outs are a "common occurrence." *Tr. 189-90.*

The Court agrees with the Government that, while the equipment malfunction is problematic, it cannot, by itself, establish that McMartin's stop was pre-textual. The Court finds McMartin a credible witness. Again, the focus must remain on the officer's objective assessment. McMartin's subjective state of mind is of no consequence. Indeed, a highway patrol trooper would be remiss had he observed similar driving and not stopped the vehicle.

Furthermore, based on the evidence in Det. Barnes search warrant application, it appears law enforcement had sufficient independent probable cause to stop Norlin for drug trafficking. Even disregarding Norlin's visit to his source of supply, corroboration from confidential sources and suspicion of trafficking drugs from Billings, an objective assessment of the transaction of a white powdery substance into a plastic baggy in the parking lot of a hydroponics shop compels the conclusion that a drug transaction had very likely taken place. Agent Dunlap testified that he had seen drug similar transactions take place in broad daylight, "[more times than I can count []." Tr. 133. Agent Dunlap stated that in his 25 years as a DEA agent what he

observed appeared to him to be a drug transaction. *Tr. 134.*

The Court finds law enforcement possessed independent probable cause to stop Norlin for trafficking drugs. A fabricated pre-textual stop to undertake a fishing expedition, as suggested by Norlin, does not logically follow.[1]

## II. Search Warrant

Norlin argues that the state search warrant application and all evidence seized from it should be suppressed because the affiant added a false statement or omission knowingly and intentionally or with reckless disregard for the truth in accordance with *Franks v. Delaware,* 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978).

The Government objected to a *Franks* hearing on the ground that Norlin had not made a prima facie showing of false statements. Nevertheless, in an abundance of caution, the Court allowed Norlin to make a record concerning the validity of the warrant application. *Franks* provides a two part test to determine when a warrant must be voided. First, a defendant must show by a preponderance of the evidence

---

[1] Norlin also argues that he was detained longer than necessary which violated his Fourth Amendment rights. Norlin asserts that the duration of the traffic stop was such that it operated as an arrest. However, the record, including the dashboard camera, does not evidence any untoward detention. Norlin performed field sobriety tests, was told law enforcement was obtaining a warrant for his truck and allowed to used McMartin's cell phone to call his wife for a ride. McMartin testified that he told Norlin he was not under arrest and free to go. *Tr. 114, 115.*

that the affiant included false information in the search warrant affidavit either knowingly and intentionally, or with reckless disregard for the truth. 438 U.S. at 155–56. Second, with the false material set aside, the affidavit is insufficient to establish probable cause. *Id.*

*Franks* also applies to omissions when: (1) the omission is the result of deliberate or reckless disregard for the truth, and (2) without the omission, the affidavit would have been insufficient to establish probable cause. *United States v. Kyllo*, 37 F.3d 526, 529 (9th Cir.1994).

Norlin alleges what he deems to be specific facts which he argues evidence deliberate falsehood or reckless disregard for the truth in the application. First, he alleges the application omitted that he had been outside in the cold without a coat during the sobriety tests and that he suffered from COPD, which explain his shaking, trembling and acting nervous.

The Court finds this alleged omission does not undermine the warrant application and is not overtly dishonest. Indeed, as pointed out by the Government, an affiant is not required to include every possible theory that might contravene probable cause. Norlin's suggestion that he was subjected to freezing temperatures and hypothermic as opposed to being nervous are further belied by the fact that the officer's offered to retrieve his coat, which he refused, presumably because it

contained methamphetamine. See *Tr. 106, 171*. In sum, any omission of Norlin's COPD or the weather conditions in the warrant application are immaterial at best.

Norlin suggests that a finding of probable cause was somehow compromised because he possessed a Montana medical marijuana card– which was not contained in the application. However, considering the totality of the circumstances, it is unclear how this information would have undermined a finding of probable cause. The warrant application is silent concerning marijuana, thus Norlin's medical marijuana card is irrelevant.

Norlin argues that the warrant application did not contain sufficient corroborating evidence. As the Government points out, that is incorrect. The warrant application identifies two confidential sources who corroborated information obtained by law enforcement, including identification of Norlin's vehicles.

In sum, after an ample opportunity to do so, Norlin failed to present any compelling basis to question the validity of the search warrant application under a *Franks* review. Norlin does not identify any specific material false information or facts in the affidavit. Nor does Norlin present any *material* omissions. Even assuming there were material omissions, Norlin fails to establish by a preponderance of the evidence that without the omissions, the warrant application would fail for want of probable cause. In sum, the Court finds no material falsehoods or omissions

which would compromise a finding of probable cause in the search warrant application.

## CONCLUSION

Based on the foregoing, **IT IS ORDERED:**

1.  Norlin's Motion to Suppress and Dismiss Indictment (*Doc. # 12*) is **DENIED.**

2.  The Governments's Motion to Exclude Expert Witness *(Doc. #29)* was addressed at the hearing and is therefore **DENIED** as moot.

The Clerk of Court shall notify the parties of the making of this Order

DATED this 31st day of May, 2013.

/s/ Jack D. Shanstrom
Jack D. Shanstrom
Senior U.S. District Judge